**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

WILLIAM A. DAVIS,                )          3:11-cv-00501-RCJ-WGC
                                 )
       Plaintiff,            )          **REPORT AND RECOMMENDATION**
                                 )          **OF U.S. MAGISTRATE JUDGE**
       vs.                   )
                                 )
DR. KAREN GEDNEY, et. al.        )
                                 )
                                 )
       Defendants.           )
_____  )

      This Report and Recommendation is made to the Honorable Robert C. Jones, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 32.)[1] Plaintiff opposed (Doc. # 38) and Defendants replied (Doc. # 39). After a thorough review, the court recommends that Defendants' motion be granted.

## I. BACKGROUND

      At all relevant times, Plaintiff William A. Davis was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Am. Compl. (Doc. # 7-1) at 1.) The events giving rise to this litigation took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants are Robert Bannister, Karen Gedney, Marsha Johns, and John Peery. (*Id.* at 2.)

      On screening, the court determined that Plaintiff states a colorable claim for deliberate

---

[1] Refers to court's docket number. Unless otherwise noted, all page number references are to the page numbers from the docketed version and not Defendants' original page numbers.

1   indifference to a serious medical need under the Eighth Amendment. (Screening Order (Doc.

2   # 7) at 3.) Plaintiff alleges a chronic denial of proper medical care for his lower leg from at least

3   January 2010 to the time his complaint was filed, resulting in a severe staph infection and

4   osteomyelitis which he contends may lead to the amputation of the infected limb. (Doc. # 7-1.)

5        Plaintiff asserts that defendant Bannister is responsible for developing and enforcing

6   NDOC's medical policies and procedures, and became aware of Plaintiff's condition through

7   grievances and medical records, but failed or refused to ensure Plaintiff received adequate care

8   to alleviate his condition. (*Id*. at 4-5.) He goes on to aver that defendant Johns directed the

9   nurse who was assisting him in cleansing his wounds to stop the assistance as Plaintiff was able

10  to do it for himself, thereby exposing him to increased risk of additional infection. (*Id*. at 6-7.)

11  Next, he alleges that defendant Gedney refused to allow him to see a proper specialist for

12  treatment of his wound or to provide proper directions to prison medical staff for such

13  treatment. (*Id*. at 8-9.) Finally, he claims that defendant Peery is liable for a denial of proper

14  medical care because he denied Plaintiff's request for "adequate medical attention" and advised

15  Plaintiff, without proper knowledge or training, that "some things are not fixable, though I'm

16  not certain this will be the case with your leg" and further advising him that he may not be a

17  good candidate for skin grafts. (*Id*. at 10-11.)

18       Defendants now move for summary judgment, arguing that Plaintiff's allegations do not

19  rise to the level of deliberate indifference; instead, they assert that they merely amount to a

20  difference of opinion regarding the treatment Plaintiff received. (Doc. # 32.) They also argue

21  that Plaintiff cannot recover damages against them in their official capacities and that they are

22  entitled to qualified immunity. (*Id*.)

23                                **II.  LEGAL STANDARD**

24       "The purpose of summary judgment is to avoid unnecessary trials when there is no

25  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

26  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

27  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing

28                                           2

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.*  at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

3

1   nonmoving party failed to make a showing sufficient to establish an element essential to that

2   party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at

3   323-25. If the moving party fails to meet its initial burden, summary judgment must be denied

4   and the court need not consider the nonmoving party's evidence. *See Adickes v.  S.H. Kress &*

5   *Co.*, 398 U.S. 144, 160 (1970).

6          If the moving party satisfies its initial burden, the burden shifts to the opposing party

7   to establish that a genuine issue of material fact exists. *See Matsushita Elec.  Indus.  Co.*

8   *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

9   the opposing party need not establish a material issue of fact conclusively in its favor. It is

10  sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

11  parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

12  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The

13  nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

14  that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions

15  and allegations of the pleadings and set forth specific facts by producing competent evidence

16  that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

17         At summary judgment, a court's function is not to weigh the evidence and determine the

18  truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

19  While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

20  drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

21  significantly probative, summary judgment may be granted. *Id*. at 249-50, 255 (citations

22  omitted).

23                        **III. DISCUSSION**

24  **A. Legal Standard- Eighth Amendment Deliberate Indifference to a Serious**

25  **Medical Need**

26         A prisoner can establish an Eighth Amendment violation arising from deficient medical

27  care if he can prove that prison officials were deliberately indifferent to a serious medical need.

28                              4

1  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

2  stringent in cases involving a prisoner's medical needs than in other cases involving harm to

3  incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

4  care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

5  974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

6  F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

7  inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

8  or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

9       A finding of deliberate indifference involves the examination of two elements: "the

10  seriousness of the prisoner's medical need and the nature of the defendant's responses to that

11  need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir.

12  2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

13  exists if the failure to treat a prisoner's condition could result in further significant injury or

14  the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*,

15  429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical

16  need by demonstrating that failure to treat a prisoner's condition could result in further

17  significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions

18  that are "serious" in nature include "an injury that a reasonable doctor or patient would find

19  important and worthy of comment or treatment; the presence of a medical condition that

20  significantly affects an individual's daily activities; or the existence of chronic and substantial

21  pain." *Id*. at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting

22  *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several

23  months demonstrated a serious medical need).

24       If the medical needs are serious, Plaintiff must show that Defendants acted with

25  deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213

26  (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v.*

27  *Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more

28

than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

In addition, a prison physician is not deliberately indifferent to an inmate's serious medical need when the physician prescribes a different method of treatment than requested by the inmate. *See McGuckin*, 974 F.2d at 1059 (explaining that negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *see also Snow v. McDaniel*, 681 F.3d 978, 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (difference of opinion between a prisoner-patient and medical staff regarding treatment is not cognizable under § 1983). To establish that a difference of opinion amounted to deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted); *see also Snow*, 681 F.3d at 988 (quoting

6

*Jackson*, 90 F.3d at 332) (finding that "a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under the circumstances").

**B. Summary of Medical Evidence**

### 1. Background Medical Records

According to the medical records, Plaintiff's lower leg condition stemmed from injuries sustained in a motor vehicle accident that took place prior to the time he was incarcerated. (*See* Ex. A, Doc. # 33-1 at 2; Ex. B, Doc. # 33-1 at 13, 14 . During the accident, his skin was scraped over the ankle area, and Plaintiff went to the emergency room on two occasions. (Ex. A, Doc. # 33-1 at 2.) He was given medicine to put on the wound, and it healed up in a couple of weeks. (*Id*.) According to his medical records, following his incarceration, in April 1995, he reported that he was experiencing drainage in the affected area. (*Id*., 5.) It was noted that he "developed a rapid and firm equinus and varus deformity to the right ankle" which was "treated with whirlpool, and attempts at stretching." (*Id*.) He was also prescribed medication for the pain. (*Id*.) However, he did not fully heal, and in July 1995, the condition became worse and he started walking on an inverted leg. (*Id*.) Plaintiff saw Dr. Gedney on July 25, 1995. (*Id*. at 5.) Dr. Gedney observed that Plaintiff's right inverted ankle was totally frozen and she was unable to move or straighten it. (*Id*.) X-rays and a bone scan were ordered. (*Id*. at 2, 5-6.) Plaintiff was prescribed various medications. (*Id*. at 2, 6.)

Dr. Gedney referred Plaintiff to Dr. Walls for an evaluation on July 27, 1995, and the examination revealed discolored skin, a wide ulceration and serious granulation tissue. (*Id*. at 2, 5.) Movement of the foot caused Plaintiff great pain. (*Id*. at 2.) He was diagnosed as having: (1) "probable right distal tibia osteomyelitis" and (2) "rapid developing equinovarus to the right ankle." (*Id*.) Dr. Walls and Dr. Gedney explained to Plaintiff that he presented a difficult situation, and it was unclear whether they would be able to correct the foot deformity. (*Id*.) The possible course of action was described to Plaintiff, and it was noted that the course would be difficult and may not achieve success. Alternatively, Plaintiff was advised that amputation was

7

1   another option. (*Id.*) Plaintiff indicated that he wanted to try to salvage the limb first. (*Id.*)

2       On July 31, 1995, Dr. Walls consulted with another orthopedic specialist, Dr. Boyden,

3   who agreed to evaluate Plaintiff for possible surgery, and this was explained to Dr. Gedney who

4   stated that she would try to get approval from the prison for this consultation. (Doc. # 33-1 at

5   4.) The next note from Dr. Walls states that Dr. Gedney confirmed that the prison agreed to

6   transfer Plaintiff to the care of Dr. Boyden. (*Id.*)

7       Dr. Gedney sent a memorandum to Dr. Boyden, dated August 2, 1995, with her referral

8   for Plaintiff. (*Id.*) She relayed his medical history and requested his evaluation and

9   recommendation. (*Id.*)

10      Plaintiff was admitted to the hospital for treatment by Dr. Boyden on August 7, 1995,

11  and was discharged on August 28, 1995. (Doc. # 33-1 at 7.) Dr. Boyden performed a

12  debridgement and placed an external fixator, in addition to providing local wound care. (*Id.*)

13  Plaintiff subsequently underwent a "split-thickness skin graft" by Dr. Kalanges, which was

14  described as going well. (*Id.*) Upon discharge Plaintiff was provided with wound care

15  instructions. (*Id.*)

16      A notation on Plaintiff's master problem list indicates that by June 7, 1996, the presence

17  of the ulcer was noted as well as the fact that the skin graft site was breaking down. (*Id.* at 8.)

18      A medical referral was sent by Dr. Gedney to Dr. Kalanges on August 5, 1997, noting that

19  Plaintiff had a non-healing ulcer and failed skin graft. (Doc. # 33-1 at 9.)

20      Plaintiff was seen by Dr. Long on April 4, 2001, for "chronic osteomyelitis of his right

21  distal tibia, and perhaps talus." (*Id.* at 10.) It was noted that corrective surgery was performed

22  in 1995, and following surgery, Plaintiff developed persistent drainage, which continued

23  intermittently. (*Id.*) In 1997, Plaintiff received a formal diagnosis of osteomyelitis. (*Id.*) In

24  February 2001, it was noted that Plaintiff returned to the prison system. (*Id.*) X-rays were

25  taken on February 8, 2001, revealing osteomyelitis. (*Id.*) On March 16, 2001, Dr. Johns

26  "cultured and got MRSA." (*Id.*) Plaintiff was treated with Ancef for one week which lessened

27  the drainage. (*Id.*) After that, Plaintiff experienced "mild chronic drainage." (*Id.*)

28

1    When he was evaluated by Dr. Long on April 4, 2001, it was noted that Plaintiff's "right

2  lower limb shows a sort of stasis dermatitis involving the last 5 inches of the calf and ankle."

3  (*Id*.) Plaintiff was using crutches because of the pain and deformity. (*Id*.) X-rays and an MRI

4  were ordered as well as new cultures. (*Id*.) After the results were obtained, Plaintiff was to be

5  re-evaluated. (*Id*.)

6    X-ray reports dated June 19, 2001 state that osteopenia was seen in the distal medial

7  right tibia which remained unchanged since February 8, 2001. (*Id*. at 11.) Also noted was "an

8  area of benign cortical thickening involving the posterior cortex of proximal third of the

9  diaphysis of the right fibula." (*Id*.)

10    **2. Care Alleged to be Deficient in the Amended Complaint**

11    The allegations in Plaintiff's Amended Complaint relate to medical care he received from

12  January of 2010 to September of 2011.

13    On January 1, 2010, Dr. Gedney ordered Plaintiff to be admitted to the Regional Medical

14  Facility (RMF) for "wound vac." (Doc. # 33-1 at 23.)

15    Dr. King had a consultation with Plaintiff on January 11, 2010, and recommended that

16  treatment should include use of a "wound vac," and if unsuccessful, another skin graft should

17  be performed. (*Id*. at 20.) Plaintiff agreed to be admitted for "wound vac." (*Id*. at 33.) On

18  January 14, 2010, he was given pain medication. (*Id*.)

19    Dr. Gedney ordered Plaintiff admitted to the RMF again on January 18, 2010 for "wound

20  vac" and administration of medication. (*Id*. at 23, 33.) He received "wound vac" again on

21  January 22, 2010, as well as pain medication. (*Id*. at 34.) On January 23, 2010, he complained

22  that his leg was aching and that the "wound vac" was functioning poorly. (*Id*.) It was noted that

23  the "wound vac" dressing had a leak, and the dressing was changed and the area cleaned. (*Id*.)

24  Plaintiff was again given pain medication. (*Id*.)

25    On January 25, 2010, in contrast, it was noted that the "wound vac" was working well

26  and that Plaintiff was ambulatory with minimum discomfort. (*Id*. at 35.)

27    On January 26, 2010, he was prescribed ointment for his wound. (*Id*. at 25.) He was

28

also seen for "wound vac" that day. (*Id*. at 35.) He was noted as tolerating the "wound vac" well and his pain medication was continued. (*Id*.) On January 28, 2010, Plaintiff was seen for "wound vac," and it was noted there was not a lot of drainage. (*Id*.) He would continue to be monitored and his dressing changed. (*Id*.) Dr. Gedney ordered a change in the frequency of the "wound vac" treatment. (*Id*. at 25, 35.) On January 29, 2010, Plaintiff was evaluated and instructed not to ambulate on the right foot, and to keep the wound covered. (*Id*. at 35.) The wound size was noted, as was the fact that there was no drainage. (*Id*.) Plaintiff received "wound vac" again on January 30, 2010. (*Id*.) There was a "scant" amount of drainage. (*Id*.)

On February 1, 2010, Plaintiff was referred by Dr. Johns to Dr. King at NNCC regarding the chronic drainage in his leg. (Doc. # 33-1 at 17.) Dr. King noted that they had done everything possible, but there had been minimal progress with the "wound vac." (*Id*.) He stated that the wound "looked good" for another skin graft if Plaintiff agreed, and it appears that Plaintiff responded that he would like to consult with Dr. Gedney. (*Id*. at 21.) It was also noted that Dr. King was doubtful another skin graft would work. (*Id*. at 37.) He reported that the surgeon said that Plaintiff's venous system was not operable, and doubted it would promote new tissue growth. (*Id*.) Plaintiff indicated he wanted to leave. (*Id*.) He was noted as having a "chronic non-healing venous ulcer" and "wound vac" did not help. (*Id*.) When he was advised a skin graft probably would not help, he indicated he did not want to go through another surgery. (*Id*.) It was noted that Dr. Gedney would discuss this with the patient and "give conservative care." (*Id*.)

On February 3, 2010, he was prescribed Naproxyn and a dressing change. (*Id*. at 25.)

On February 4, 2010, Plaintiff's dressing was changed and he  was ordered discharged from the RMF, and the "wound vac" was discontinued as well. (Doc. # 33-1 at 26, 36.) Plaintiff was ordered to be given supplies to bandage his wound and instructions for follow-up care. (*Id*.) He was also prescribed various medications. (*Id*.)

Plaintiff had his dressing changed and was provided with pain medication throughout February and March of 2010. (*Id*. at 25-28, 37-41.)

1    On April 5, 2010, the progress note indicates that Dr. Johns said that Plaintiff was able

2    to change his own dressings. (*Id*. at 41.) Plaintiff was then seen on April 12, 2010, for a dressing

3    change and it was noted that he did it by himself. (*Id*.)

4    On April 6, 2010, his pain pack was discontinued until he was seen by the doctor, but

5    it appears it was reinstated on April 12, 2010 once he saw Dr. King. (Doc. # 33-1 at 28.)

6    Plaintiff saw Dr. King again on April 12, 2010, and stated that the only option, in his

7    opinion, is another attempt at a skin graft, although that had failed already. (*Id*. at 22, 41.) He

8    continued to be prescribed pain medication after his appointment with Dr. King. (*Id*. at 41.)

9    There are several other notations of Plaintiff presenting for dressing changes on an

10    almost-daily basis from April of 2010 through October of 2011. (*See id*. at 41-45.)

11    Orders continuing the prescription of Plaintiff's pain medication appear throughout the

12    records for this time period as well. (*Id*. at 29-31.) He was also prescribed various creams

13    during this time period. (*Id*.)

14    Plaintiff sent a grievance (not a medical kite which is a request for medical attention)

15    dated July 5, 2010, to the attention of Dr. Johns and Dr. Gedney, asking if there is anything else

16    that could be done to correct his condition. (*Id*. at 47.) The grievance was returned to Plaintiff

17    as improper because he should have submitted a medical kite directly to Dr. Johns or Dr.

18    Gedney if he was seeking medical care. (*Id*. at 48.)

19    In response, Plaintiff submitted an informal level grievance dated August 4, 2010,

20    stating that he had seen Dr. Gedney, who told him she could not do anything for him medically,

21    and therefore, his intention was not to submit a medical kite but a grievance regarding this

22    situation. (*Id*. at 49.) In response, he was told that he had been diagnosed with a chronic, non-

23    healing venous ulcer, and that he had been advised by his health care providers that surgery

24    was not an option because he previously had a skin graft performed, which failed. (*Id*. at 50.)

25    He was told to follow his physician's advice and continue with the dressing changes and to

26    inform them if his condition changed. (*Id*.)

27    Plaintiff then sent a first level grievance, dated September 12, 2010, stating that NDOC's

28

1    lack of money was not an excuse for his lack of care, and reiterating his request to have his

2    condition repaired. (*Id.* at 51.) In response, he was told that his first level grievance was being

3    returned as improper because he failed to attach the prior level documentation. (*Id.* at 52.)

4    However, it appears he did receive a substantive response from defendant Peery, stating the

5    following:

6         Mr. Davis,
          You've missed one important element. Some things aren't fixable. Though I'm
7         not certain this will be the case with your leg ulcer, having had a failed graft is not
          a great predictor for the success of any other attempts. For now, you're to follow
8         the advice of the doctor treating you and have some patience regarding the
          outcome of a hard to treat stubborn vascular condition.
9         The informal level answer was adequate.
          You are being followed medically.
10        Grievance denied.

11   (*Id.* at 53.) Plaintiff filed a second level grievance indicated that he disagreed with defendant

12   Peery's response. (*Id.* at 54.) He stated that defendant Peery was not a doctor or physician's

13   assistant, and therefore did not have the knowledge to make such a conclusion about Plaintiff's

14   condition. (*Id.*) Dr. Bannister submitted a response to the second level grievance, upholding

15   defendant Peery's response to the first level grievance, and stating that the "practitioner at

16   NNCC is best able to assess you [sic] complaints and determine if treatment is indicated. Please

17   kite to be seen." (*Id.* at 56.)

     **C. Analysis**

18        As to the first prong of the court's Eighth Amendment inquiry, Defendants do not

19   dispute that Plaintiff suffers from a serious medical condition. (*See* Doc. # 32 at 9:6-10.) The

20   court will therefore shift its focus to the second prong of the Eighth Amendment analysis:

21   whether Defendants were deliberately indifferent to Plaintiff's serious medical condition.

22        The court concludes that there is simply no evidence to establish Defendants acted with

23   deliberate indifference. The medical records demonstrate that from January 2010 through

24   September 2011, Plaintiff received responsive and appropriate medical care in response to his

25   chronic condition. While it is extremely unfortunate that Defendants cannot do more to treat

26   Plaintiff's lower leg, the records establish that they responded in a timely fashion to his

27

28                                                    12

1   complaints, referred him to specialists when necessary, advised him of available courses of

2   treatment, and provided him with what care they could when it was clear that alternative

3   courses of treatment were not likely to be successful.

4       Deliberate indifference requires knowledge and disregard of an excessive risk to

5   Plaintiff's health. Plaintiff has not presented facts rising to that level. At best, he has presented

6   a difference of opinion with respect to the treatment he has received, but even then, it is not at

7   clear what he is suggesting his health care providers should have done or should do differently.

8   He has certainly not shown that the care was "medically acceptable under the circumstances"

9   and chosen "in conscious disregard of an excessive risk to [his] health"-- a prerequisite to a

10  finding of deliberate indifference in the context of a difference of opinion.

11      Plaintiff's Amended Complaint takes issue with the conduct of Dr. Bannister insofar as

12  he promulgates NDOC's medical policies and procedures, and he responded to Plaintiff's

13  second level grievance. The evidence demonstrates that Dr. Bannister was presented with a

14  second level grievance, and he stated that his healthcare providers on site were in the best

15  position to evaluate his care. This court cannot conduct that this conduct rises to the level of

16  deliberate indifference when Plaintiff's medical records (which Dr. Bannister would have had

17  access to) demonstrate that Plaintiff was receiving appropriate care under the circumstances.

18      Nor does Plaintiff present evidence that Dr. Gedney was deliberately indifferent to his

19  serious medical condition. His claim that she refused to allow him to see a proper specialist or

20  to provide proper directions to staff for his treatment is belied by his medical records which

21  establish that she provided him with responsive and appropriate care, including referral to

22  specialists and giving instruction to prison staff for his care, from the time she was made aware

23  of his condition.

24      As to Dr. Johns, Plaintiff claims that he should not have ordered that Plaintiff change

25  his dressings himself, but the medical records are clear that Plaintiff was able to do so without

26  incident, and that he also presented for dressing changes on numerous occasions after that

27  order, all seemingly without incident. There is no evidence that this exposed him to any

28

1   increased risk of infection. Plaintiff has merely presented his supposition that this was the case.

2   Nor is there any other evidence that Dr. Johns knew of and disregarded an excessive risk to

3   Plaintiff's health.

4      Finally, with respect to defendant Peery, Plaintiff's chief complaint is that he is not a

5   doctor or physician's assistant with the requisite knowledge to respond to Plaintiff's grievance

6   or make a conclusion about Plaintiff's medical condition. Defendant Peery, as a nurse employed

7   by NDOC, was certainly in a position as a grievance responder, to review Plaintiff's medical

8   records and relay their contents (albeit not in the most eloquent or empathetic fashion), *i.e.*,

9   that a skin graft was not likely to be successful because Plaintiff had already undergone a failed

10  skin graft. This conduct does not amount to disregard of an excessive risk to his health. Rather,

11  Nurse Peery was merely telling Plaintiff what his primary health care providers had already

12  advised him.

13     At this point, the court finds that Defendants have met their burden of presenting

14  evidence to negate an essential element of Plaintiff's Eighth Amendment claim. The court will

15  now turn to the arguments asserted in Plaintiff's opposition to determine if he has presented

16  evidence that raises a genuine issue of material fact.

17     In his opposition, Plaintiff first argues that his claim of deliberate indifference against

18  Defendant Gedney is well supported because she admits she ordered a brace for the Plaintiff,

19  but it was denied by the Utilization Review Panel (URP). (Doc. # 38 at 2.) This does not show

20  deliberate indifference on the part of Defendant Gedney, but possibly indicates liability on the

21  part of the URP. While Plaintiff received discovery responses from Dr. Bannister and Dr. Johns

22  indicating that they were members of the URP at some point in time, it is not clear that they

23  were involved in this particular request. (*See* Doc. # 38 at 6.) In addition, their responses stated

24  that Plaintiff's medical records did not indicate that a referral for a brace was requested of the

25  URP. (*See id.* at 10.) Dr. Gedney does admit that she recommended Plaintiff for prosthesis (*see*

26  *id.* at 11), but again, this does not show deliberate indifference on her part, and there is no

27  evidence that any of the named defendants were members of the panel that received this

28

14

request. Even if this was apparent, that does not mean there may not have been valid reasons for denial of the request. The court simply does not have that evidence before it. Therefore, Plaintiff's argument fails in this regard.

Next, Plaintiff argues that while Defendants claim he denied a second skin graft surgery, they did not produce a signed waiver of treatment. (Doc. # 38 at 2.) Defendants did not produce a waiver, but they did produce Plaintiff's medical records which indicate that Plaintiff was advised that a second skin graft was not likely to be successful, and Plaintiff's indication that he did not wish to proceed in that fashion. As a result, the failure to produce the waiver does not serve to create a triable issue of fact on this issue, especially when Plaintiff does not dispute that he made the election not to proceed with a second skin graft. Furthermore, even if Plaintiff did indicate that he wanted to proceed with a second skin graft (this is purely hypothetical as this is not evidenced by his medical records or anything set forth in his opposition), he would be raising a difference of opinion concerning his health care providers' decision not to proceed with the second skin graft. Given the fact that there are several notes in his medical records that a second skin graft was not likely to be successful, even if the court were presented with these facts it could not find that this rises to the level of deliberate indifference.

Plaintiff then attempts to argue that there was a delay in providing medical care which constitutes deliberate indifference. (Doc. # 38 at 3.) While Plaintiff cites the correct legal standard with respect to a delay in providing medical care--that it may rise to the level of deliberate indifference if the plaintiff can establish that it led to further injury--he does not provide specific evidence of any delay or of what injury he claims was caused by any such delay. Nor does he specify what conduct constituting a delay is attributable to each of these defendants. While he references a "strong possibility of amputation," he does not connect the actions with any specific conduct on the part of a defendant. (*See id*.)

The court concludes that Plaintiff has failed to raise a genuine issue of material fact as to Defendants' alleged deliberate indifference.

15

1   In the absence of evidence that Defendants were deliberately indifferent to Plaintiff's

2   health condition, the court must recommend that summary judgment be granted in

3   Defendants' favor. In light of this conclusion, the court need not address Defendants'

4   arguments regarding official capacity damages or qualified immunity.

5   ## IV. RECOMMENDATION

6   **IT IS HEREBY RECOMMENDED** that the District Judge enter an Order

7   **GRANTING** Defendants' motion (Doc. # 32).

8   The parties should be aware of the following:

9   1.   That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the

10  Local Rules of Practice, specific written objections to this Report and Recommendation within

11  fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate

12  Judge's Report and Recommendation" and should be accompanied by points and authorities

13  for consideration by the District Court.

14  2.   That this Report and Recommendation is not an appealable order and that any

15  notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the

16  District Court's judgment.

17  DATED: April 8, 2013.

18

19  _____

20  WILLIAM G.  COBB
    UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28                                    16